IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

APPLICATION AND AFFIDAVIT OF THE )
UNITED STATES OF AMERICA FOR A )
SEARCH WARRANT FOR THE RESIDENCE ) Magistrate No. 20-81
LOCATED AT 3427 FLAT ROAD, ) **[UNDER SEAL]**
GRAND VALLEY, PENNSYLVANIA 16420 )

**APPLICATION AND AFFIDAVIT FOR SEARCH WARRANT**

1. I, Robert Manns, being duly sworn and say:

2. I am a Special Agent with the United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives (herein referred to as ATF), currently assigned to the Pittsburgh Field Office. I have been employed as such since 2002. Prior to joining ATF, I was employed for five (5) years as a Police Officer with Montgomery County Police Department, Montgomery County, Maryland.

3. Your affiant has been participating in criminal investigations with ATF relating to the violation of the federal firearms and narcotics laws during those periods. Through your affiant's training and experience as a Special Agent for ATF, and my work with state and local law enforcement officers, I am familiar with federal firearms and narcotics laws as follows:

4. In accordance with Title 18, United States Code, Chapter 44, Section 922(g)(3), it is unlawful for any person who is an unlawful user of or addicted to any controlled substance (as defined in section 102 of the Controlled Substances Act (21 USC 802)) to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition;

1

or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

5. A firearm as defined by Title 18, United States Code, Chapter 44, Section 921 (a) (3) is: (a) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by action of an explosive: (b) the frame or receiver of any such weapon; (c) any firearm muffler or firearm silencer; or any destructive device.

6. In accordance with Title 21, United States Code, Chapter 13, Sections 841 and 846, it is unlawful for any person to knowingly or intentionally manufacture, distribute, or dispense, or possess with the intent to manufacture, distribute or dispense, a controlled substance, or conspire to do so.

7. Controlled substances, according to Title 21, United States Code, Section 812, are established in five schedules know as Schedules I, II, III, IV, and V. Methamphetamine is listed as a Schedule II controlled substance. Marijuana is listed as a Schedule I controlled substance.

8. In accordance with Title 18, United States Code, Chapter 44, Section 924(c)(1)(A), it is unlawful for any person who, during and in relation to any crime of violence or drug trafficking crime (including a crime of violence or drug trafficking crime that provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device) for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm.

9. Your affiant is familiar with the facts and the circumstances set forth herein as a result of personal participation in this investigation and based on information provided by others mentioned herein, including state and local law enforcement officers.

## TARGET LOCATION

10. This affidavit is submitted in support of an application for a search warrant for the following **TARGET LOCATION**, which is also described in **Attachment A**.

11. **TARGET LOCATION – 3427 Flat Road, Grand Valley, PA** (Warren County) and within the Western District of Pennsylvania, further described as a single family, one story residence with brown, wood siding. The foundation is cement block. There is a propane tank in the yard on the left side of the residence. There are three windows and a cement block chimney on the left side of the house, of which the two rear windows have an air conditioning unit within. There is a single, white door with a glass window within just to the right of center on the front of the house. There are two single windows to the left of the front facing door and a double window to the right of the door. There is an air conditioning unit in the double window. There is a satellite dish mounted on the front left corner of the residence and a satellite dish mounted to a wood post just off the right front corner of the residence. The post is placed in the ground. At the end of the dirt driveway that leads from the back of the house to the roadway, there is a US Post Office mailbox. Attached to the post of the mailbox is the address "3427" for the property. There is one outbuilding on the left side of the property that appears to be a camouflaged pop up tent with sides within the property of the **TARGET LOCATION**.

## PROBABLE CAUSE

13. On December 13, 2018, your affiant and Pennsylvania State Police (PSP) Trooper Jesse King interviewed an individual identified herein by the initials RY. RY was interviewed following his arrest on an outstanding state warrant and at the time of his arrest was found in possession of an AR-style rifle. Information provided by RY has proven reliable in furthering

this investigation and has been corroborated by phone records, pen registers, surveillance, searches (to include data obtained from phone and social media platforms) and by information provided by other confidential sources.

14. RY stated that he knows Carina TUCKER and knows that TUCKER and her associates will travel to Ohio to purchase methamphetamine. RY stated that he has been with Carina TUCKER on two occasions when she traveled to Ohio to get methamphetamine. RY further stated that on December 3, 2018, TUCKER, Kevin HUET, and others drove to a house in Ohio where TUCKER obtained meth.

15. On December 28, 2018, your affiant interviewed a Confidential Source (herein "CS"). CS admitted to being a regular user of methamphetamine. Information provided by CS has proven reliable in furthering this investigation and has been corroborated by phone records, pen registers, surveillance, searches (to include data obtained from phone and social media platforms) and by information provided by other confidential sources.

16. CS stated that Kevin HUET goes by the nickname "Huey". CS stated that they have known HUET to carry a very tiny handgun all the time. CS further stated that HUET is closely associated with Carina TUCKER, a substantial methamphetamine dealer in the Titusville, PA area.

17. On November 12, 2019, your affiant and Pennsylvania State Police (PSP) Trooper Jesse King, met with an individual identified herein by the initials KO. At the time of the interview KO was incarcerated on state felony drug distribution charges. KO is a target in a joint ATF/PSP investigation into methamphetamine distribution in the Warren and Titusville, Pennsylvania areas. KO acknowledged that she had been a methamphetamine trafficker and

distributor in connection with other area methamphetamine distributors. Information provided by KO has proven reliable in furthering this investigation and has been corroborated by phone records, pen registers, surveillance, searches (to include data obtained from phone and social media platforms) and by information provided by other confidential sources.

18. KO stated that Kevin HUET is a "runner" for Carina TUCKER. Your affiant knows that the term "runner" is used to describe a person who transports illegal narcotics from one place to another and does so for a specific person or organization.

19. On November 25, 2019, your affiant and Pennsylvania State Police (PSP) Trooper Jesse King met with Confidential Source 2 (herein "CS2"). CS2 acknowledged being a regular user of methamphetamine. Information provided by CS2 has proven reliable in furthering this investigation and has been corroborated by phone records, pen registers, surveillance, searches (to include data obtained from phone and social media platforms) and by information provided by other confidential sources.

20. CS2 stated he/she has known Kevin HUET for six years and stated HUET lives just off the "S" bend at the intersection of Selkirk Rd and Flat Rd with his mother.

21. CS2 stated that HUET is the muscle and enforcer for Carina TUCKER. CS2 stated that he/she has personally witnessed HUET's efforts to enforce on behalf of TUCKER and has heard from others that HUET will "rough" people up, spray paint and vandalize vehicles, and drive past a person's house while shooting a gun into the air.

22. CS2 knows HUET to own/possess handguns and rifles and stated that he/she has been at HUET's residence when both he/she and HUET would get high on methamphetamine and HUET would open the windows in the house and shoot his guns out said windows.

5

23. CS2 stated that he/she has known HUET to be a methamphetamine user for the entire time they have known on another and stated "if he (HUET) could, he'd use (methamphetamine) all the time". CS2 stated that he/she knows that HUET gets his methamphetamine from TUCKER by either buying it from her or getting it as a reward for serving as her enforcer.

24. On January 17, 2020, your affiant and Titusville Police Department Officer Jeff Prugh, interviewed an individual identified herein by the initials SB. At the time of the interview, SB had been incarcerated on outstanding warrants. SB is a target in a joint ATF/PSP investigation into methamphetamine distribution in the Warren and Titusville, Pennsylvania areas. SB acknowledged that she had been a methamphetamine trafficker and distributor in connection with other area methamphetamine distributors. Information provided by SB has proven reliable in furthering this investigation and has been corroborated by phone records, pen registers, surveillance, searches (to include data obtained from phone and social media platforms) and by information provided by other confidential sources.

25. SB stated that she has known Kevin HUET for approximately 6-7 years and that they are close friends. She further stated that HUET acts as an "enforcer" for TUCKER and was TUCKER's "collector of debts". SB further stated that she was with TUCKER on a few occasions when TUCKER specifically told HUET that a certain person owed her money. SB stated that she then watched HUET load a gun and walk out the door to collect said debt. SB further stated that HUET was "successful" and replied "the money always came back with him". SB further stated that she was at TUCKER's residence on said occasions when HUET returned

(SB stated that she lived at TUCKER's residence from September 24, 2018 thru December 19, 2018) SB further described HUET's gun as being a small, break open .22 caliber handgun.

26. SB described an incident where she was with HUET when HUET received a voicemail. She stated that they then traveled to an area located behind the Grand Valley Volunteer Fire Department. Upon arrival, HUET walked toward a parked car, removed his handgun and put it to the temple of an individual identified herein as ES. SB stated that she was approximately 20 feet away and while witnessing said act, watched ES put something into HUET's hand.

27. On or about March 30, 2020, your affiant, having applied for and been granted a federal search warrant on February 28, 2020 for Facebook ID 1000004609277399, an account belonging to Kevin HUET, received the information from Facebook. Upon review of the information received, it was revealed that Kevin HUET, through the use of Facebook Messenger, is engaged in buying and selling narcotics and firearms and has been utilizing the Facebook Messenger application from June 1, 2018 through February 28, 2020. After reviewing posts on HUET's Facebook Messenger pages, both the writings of HUET and/or the writings of his associates, your affiant concluded based on the content of his Facebook page that Kevin HUET uses and distributes methamphetamine and marijuana. Your affiant also concluded that Kevin HUET will obtain/attempt to obtain firearms from others associated with narcotics trafficking and personal use, and as documented below, will use narcotics as payment for obtaining firearms.

28. On October 14, 2019, HUET used his Facebook account to communicate with a Facebook account associated with an individual identified as WL and indicate that HUET has a

supply of methamphetamine he is able to sell. Later on December 12, 2019, via Facebook HUET agreed to sell WL a "ball" for $130. Your affiant is aware through training and experience as well as my involvement in this investigation and the terminology frequently used by individuals engaged in the sale and purchase of methamphetamine, that a "ball" or an "eight ball" is a reference to 3.5 grams or approximately 1/8th of an ounce of methamphetamine. HUET sold methamphetamine to WL again via Facebook on December 26, 2019.

29. In and around October 2019, an account associated with         sent a message to HUET.         asked to buy methamphetamine and the two arranged a meeting. HUET indicated he would sell         an "8 ball." Based on training and experience as well as familiarity gained through the course of past investigations and this case with the terminology typically used by drug users and dealers, your affiant knows that a "ball" or sometimes an "eight ball" is a common reference to 3.5 grams or approximately 1/8th of an ounce.         tells HUET that         has "runners" who deal for him.

30. On December 15, 2019, a Facebook account with the name "         " communicated with HUET in an attempt to sell HUET a Hi-Point Model C9, 9mm pistol for $150.00. HUET stated he wanted to trade methamphetamine for the firearm. "         " agreed to take ¼ of an ounce of methamphetamine in exchange for the firearm and sent HUET a photograph of the gun. HUET confirmed the deal in a message that asked "do you want ¼ for it" and included a photo of methamphetamine on a digital scale weighing 7.06 grams. HUET asked if the gun was stolen to which "         " responded "no, it's straight."

31. On or about March 21, 2019, HUET sent a message to a Facebook account with the name         (FB ACCT. #         ) where HUET asked if         needed

8

a resupply. responded that he did not need any right now as he had been making regular trips to Ohio for methamphetamine. expressed pleasure at the prices he'd been getting, paying $1200.00 for a quarter pound.

32. On or about January 11, 2020, a Facebook account associated with RY messaged HUET expressing dissatisfaction with the quality of the methamphetamine he had received from HUET's supplier. HUET and RY had a lengthy discussion concerning who was to blame for the poor quality of the methamphetamine.

33. Your affiant knows, from information provided through the assistance of other police officers employed by local law enforcement agencies and the Pennsylvania State Police, that many of HUET's Facebook contacts are users of/or distributors of methamphetamine.

34. On July 23, 2020, your affiant and Pennsylvania State Police (PSP) Trooper Jesse King, interviewed an individual identified herein by the initials RS. On July 22, 2020, RS was arrested on state charges for being in possession of a concealed Colt, model Python, .357 revolver. At the time of the interview RS was incarcerated on that charge. Information provided by RS has proven reliable in furthering this investigation and has been corroborated by phone records, pen registers, surveillance, searches (to include data obtained from phone and social media platforms) and by information provided by other confidential sources.

35. RS stated that on July 21, 2020, he was at the residence of Kevin HUET (the location described by RS is consistent with that known to your affiant as the residence at 3427 Flat Road, Grand Valley, PA, the Target Residence) when HUET asked him if he wanted to buy a gun. RS agreed and HUET sold him a Colt Python, .357 Magnum revolver for $1000. Furthermore, RS stated that prior to buying this revolver from HUET, he shot the gun at HUET's

9

residence and HUET provided the ammunition. RS also stated that on the same date, while at HUET's residence, he and HUET "smoked a pipe" of methamphetamine. RS stated that he has known Kevin HUET since high school and knows HUET to smoke methamphetamine on a regular basis.

36. RS stated that he knows HUET to possess additional guns and stated that on the same date that he purchased the above mentioned revolver, HUET tried to sell him a semi-auto 12 gauge shotgun. RS declined and stated that he did not purchase the shotgun because he didn't have sufficient money. RS stated that the ammunition he was in possession of on the date of his arrest was provided to him by Kevin HUET.

37. A query of CLEAR on August 10, 2020, an online database, indicated that Kevin HUET has used 3427 Flat Road, Grand Valley, Pennsylvania since January 2014.

38. On August 10, 2020, a query of the Pennsylvania Department of Motor Vehicles issued driver's license database revealed that the state of Pennsylvania issued a valid class C driver's license to Kevin HUET on March 15, 2017 and that the address of record shown on said driver's license is 3427 Flat Road, Grand Valley, Pennsylvania.

42. Your affiant, based upon training and experience, is aware that it is generally a common practice for drug traffickers to store their drug inventory and drug related paraphernalia in their residences and vehicles. Further, it is generally a common practice for drug traffickers to maintain in their residences and vehicles records relating to their drug trafficking activities. Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, and/or will be "fronted" controlled substances from their suppliers, such record-keeping is necessary to keep track of amounts paid and owed, and such

records will also be maintained close at hand so as to readily ascertain current balances. Often drug traffickers keep "pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") as to the traffickers supplier(s) and the trafficker. Additionally, drug traffickers must maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking business.

43. Your affiant is also aware that it is generally common practice for drug traffickers to conceal at their residences large sums of money, either the proceeds from drug sales or monies to be used to purchase controlled substances. In this connection, drug traffickers often make use of wire transfers, cashier's checks, and money orders to pay for controlled substances. Evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking would also typically be maintained in their residences.

44. Persons involved in drug trafficking typically conceal in their residences, businesses, and automobiles large amounts of currency, financial instruments, precious metals, jewelry, and other items of value and/or proceeds of drug transactions and evidence of financial transactions relating to obtaining, transferring, secreting, or spending large sums of money derived from narcotic trafficking activities. This type of evidence also often is located in a safe. The courts have recognized that unexplained wealth is probative evidence of crimes motivated by greed, including trafficking in controlled substances.

45. Drug traffickers commonly conceal their activities from members of the public by transacting their business in a covert manner and frequently by conducting their business during the nighttime hours when darkness helps to conceal their activities. In addition, large-scale drug traffickers often have multiple locations (including residences and/or "stash houses") from which

they operate their illegal activities and in which they maintain evidence of said illegal activities. Finally, it has become common for sophisticated drug traffickers to utilize computers, cellular telephones, and/or other electronic media utilized for communication and data saving purposes, and evidence of their crimes often is found in the aforementioned electronic media.

46. Due to the illegal nature of their activities and the high risk of being "caught" by law enforcement, it is highly unusual for individuals primarily engaged in drug trafficking activities to associate regularly in their businesses or social activities with others not engaged in the same illegal drug trafficking activities.

47. Your affiant is aware that drugs such as methamphetamine is generally brought into the Erie County and Warren County area in bulk, high purity form, so as to make the most efficient use of space. High purity drugs are reduced in purity by the addition of dilutants, such as the chemical methylsulfonylmethane (MSM), sugars, sucrose and milk powder. This process is called "cutting" or "stepping on" the drugs. Other equipment, such as scales, sifters, grinders, razor blades, glass panes, mirrors, and the like typically are used in this cutting process. Once the drug has been "cut," a usual practice is to repackage it in smaller quantities in heat-sealed and/or other types of plastic bags for redistribution.

48. Your affiant is aware that typically, drug traffickers possess firearms, ammunition, and other dangerous weapons in their residences, businesses, and automobiles to protect their profits, supply of drugs, and persons from others who might attempt to forcibly take the traffickers profits and/or supply of drugs. Typically, drug traffickers maintain possession of the firearms for extended periods of time.

49. I know from my training and experience as an ATF Special Agent and, in particular, from my execution of search warrants authorizing the seizure of firearms, that those who own and possess firearms and ammunition generally maintain possession of firearms for long periods of time. The reasons owners of firearms generally maintain them over long periods of time include the fact that firearms are somewhat expensive, there is some difficulty associated with procuring them, and firearms do not easily wear out. In addition, I also know that, almost without exception, individuals who possess firearms also possess ammunition for those firearms. Owners of firearms generally maintain firearms and ammunition in and about their homes so as to permit easy access to the firearms, and firearms and ammunition must be maintained in an environment where they will be secure from theft, as well as from rust and corrosion. I know, through my training and experience, that most individuals who possess firearms retain certain documents relating to those purchases such as sales receipts, factory warranties, and cancelled checks, among their personal papers in their residence.

WHEREFORE, based upon the foregoing, your affiant believes that there is probable cause to believe Kevin HUET is an unlawful user of and/or is addicted to a controlled substance and has exhibited a continuous pattern of behavior in furtherance of intentionally manufacturing, distributing, or dispensing, or possessing with the intent to manufacture, distribute or dispense, a controlled substance, or conspiring to do same. Your affiant also believes that Kevin HUET has shown a continuous pattern of behavior regarding the possession of firearm(s) and ammunition, and items pertaining to the possession of firearms and ammunition, including documents relating to those purchases such as sales receipts, factory warranties, and cancelled checks, items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership

of the premises that is the subject of this warrant are present at the subject residence and that evidence of the following offense will be found in the areas of the residence which are under the control of Kevin HUET: Title 18, United States Code, Chapter 44, Section 922(g)(3), whereas it is unlawful for any person who is an unlawful user of or addicted to any controlled substance (as defined in section 102 of the Controlled Substances Act (21 USC 802)) to possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce and Title 21, United States Code, Section 841(a)(1) and 841(b)(1)(C) whereas it is unlawful for anyone to possess with intent to distribute a Schedule II controlled substance, to wit; methamphetamine, and Title 18, United States Code, Chapter 44, Section 924(c)(1)(A), whereas it is unlawful for any person who, during and in relation to a drug trafficking offense, possess a firearm.

WHEREFORE, based upon the foregoing, your affiant believes that there is probable cause to believe that HUET committed the crimes set forth herein and that the items listed in Attachment B are present at the subject premise and that evidence of the above offense(s) will be found at the residence of Kevin HUET.

The above information is true and correct to the best of you affiant's knowledge, information and belief.

*s/ Robert Manns*
Robert Manns
Special Agent
Bureau of Alcohol, Tobacco, Firearms and Explosives

Sworn and subscribed before me, by telephone
Pursuant to Fed. R. Crim. P. 4.1(b)(2)(A)
This 17th day of August, 2020.

Honorable Richard A. Lanzillo
United States Magistrate Judge